UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THE AYCO COMPANY, L.P,

                Plaintiff,

v.                                                           1:10-CV-0834
                                                           (GTS/RFT)
WILLIAM R. BECKER,

                Defendant.
_____

APPEARANCES:                                      OF COUNSEL:

CAHILL GAMBINO LLP                 BRIAN F. MUMFORD, ESQ.
   Counsel for Plaintiff
60 Railroad Place, Suite 202
Saratoga Springs, New York 12866

CARTER LEDYARD & MILBURN LLP     LAWRENCE F. CARNEVALE, ESQ.
   Co-Counsel for Plaintiff
2 Wall Street
New York, New York 10005

HARTER SECREST & EMERY LLP        JEFFREY J. CALABRESE, ESQ.
   Counsel for Defendant
1600 Bausch & Lomb Place
Rochester, New York 14604

GALLAGHER, HARNETT                LOUIS M. LAGALANTE, ESQ.
& LAGALANTE LLP
   Co-Counsel for Defendant
380 Lexington Avenue, Suite 2120
New York, New York 10168

HON. GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

      Currently before the Court in this breach-of-employment contract action, filed by Ayco

Company, L.P ("Plaintiff") against William R. Becker ("Defendant"), is Defendant's motion to

stay this action and compel arbitration, or in the alternative, to dismiss this action for lack of subject-matter jurisdiction. (Dkt. No. 12.) For the reasons set forth below, Defendant's motion is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that Defendant breached his employment contract with, and other common-law duties owed to, Plaintiff. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) More specifically, Plaintiff alleges that, after Defendant left Plaintiff's employ to work for Plaintiff's competitor, UBS Financial Services Inc. ("UBS"), Defendant breached the terms of his employment agreement with Plaintiff by (1) misappropriating documents containing confidential business information, (2) soliciting Plaintiff's clients to transfer their accounts to UBS, and (3) rendering financial counseling services to those clients. (*Id.*) In addition, Plaintiff alleges that Defendant shared Plaintiff's confidential and business information with UBS, and used that information for his own benefit. (*Id.*)

Based on these factual allegations, Plaintiff's Complaint asserts the following four claims: (1) a claim of breach of employment contract; (2) a claim of breach of fiduciary duty and duty of loyalty; (3) a claim of misappropriation of trade secrets; and (4) a claim of unfair competition. (*Id.*) Familiarity with the remaining factual allegations supporting these four claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties.

### B. Record Evidence Outside the Pleadings

In considering a motion to dismiss for lack of subject-matter jurisdiction, a court may consider "evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Here, the record evidence outside the pleadings reveals as follows, in pertinent part. (*See generally* Dkt. No. 12, Attach. 2-3; Dkt. No. 16, Attach. 1-5; Dkt. Nos. 21-22 [with Attachments].)

Plaintiff is a financial services company that specializes in providing personal financial counseling, investment management services and tax return preparation services to corporate executives and individuals. (*Id.*) In 1999, Defendant joined Plaintiff as a financial analyst. (*Id.*) At the time he started his employment with Plaintiff, Defendant signed a Trade Secrets and Confidentiality Agreement ("Agreement"). (*Id.*) Pursuant to the Agreement, Defendant promised to refrain from doing the following: (1) using confidential client and business information without Plaintiff's permission; (2) removing from Plaintiff's premises any of its records, including records of the names and addresses of the firm's clients; and (3) soliciting or performing services for Plaintiff's clients during the two year period following his departure from Plaintiff. (*Id.*) In addition, Defendant agreed that jurisdiction over any disputes arising between the parties under the Agreement would lie in the Northern District of New York. (*Id.*)

At some point between 1999 and 2010, Defendant applied to become a registered representative of the Financial Industry Regulatory Authority, Inc. ("FINRA"). As part of that application, he signed a FINRA Form U-4 Uniform Application for Securities Industry Registration or Transfer ("Form U-4"), which contained the following arbitration clause: "I agree to arbitrate any dispute, claim or controversy that may arise between me and my *firm*, or a

customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [Self-Regulatory Organizations] indicated in Section 4 [of this Application] . . . ." (*Id.* [emphasis in original].)

On April 16, 2010, Defendant resigned from Plaintiff's employ and went to work for UBS; and a dispute ensued between Plaintiff and Defendant that gave rise to this action. (*Id.*)

**C.     Parties' Arguments on Defendant's Current Motion**

Generally, in support of his motion (to stay this action and compel arbitration, or, in the alternative, dismiss this action for lack of subject-matter jurisdiction), Defendant argues that, regardless of the parties' Agreement, the parties must submit their dispute to FINRA pursuant to the rules of FINRA. (Dkt. No. 12, Attach. 1 [Def.'s Memo. of Law].)

More specifically, FINRA Rule 13200(a) provides that, "[e]xcept as otherwise provided in the Code [of Arbitration Procedure for Industry Disputes], a dispute must be arbitrated . . . if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons." FINRA R. 13200(a). "Member" is defined as "any broker or dealer admitted to membership in FINRA ." FINRA R. 13100(o). "Associated Person" is defined as "[a] natural person who is registered or has applied for registration under the Rules of FINRA." FINRA R. 13100(a) & (r).

Applying these FINRA rules, Defendant argues that this dispute must be arbitrated before FINRA for the following three reasons: (1) although the Agreement did not contain an arbitration clause, as a condition of his employment Defendant was required to become licensed as a "registered representative" of the National Association of Securities Dealers, Inc. ("NASD")

(n/k/a FINRA), through Plaintiff's affiliate, Mercer; (2) to register with FINRA, Defendant signed a Form U-4 Agreement, which states that "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm . . . that is required to be arbitrated under the rules . . ."; and (3) Mercer is a "member" of FINRA, and, through Defendant's registration with FINRA, Defendant became an "associated person" for purposes of FINRA.  (Dkt. No. 12, Attach. 1 [Def.'s Memo. of Law].)

Defendant further argues that Plaintiff, as a non-signatory of the Form U-4 Agreement, may be bound by its terms, for the following three reasons: (1) although *Mercer* agreed, in the arbitration clause of the Form U-4 Agreement, to arbitrate disputes arising out of the business activities of a member or an associated person, *Plaintiff* is the real party in interest with regard to that arbitration clause, and is therefore estopped from avoiding arbitration; (2) because Mercer is Plaintiff's agent, Plaintiff is bound (under agency law) by the arbitration clause of the Form U-4 Agreement, which Mercer entered into for Plaintiff's benefit; and (3) because Plaintiff so dominates and controls Mercer as to be the alter ego of Mercer, Plaintiff is bound by the arbitration clause of the Form U-4 Agreement.  (*Id.*)

Generally, in response, Plaintiff argues as follows: (1) FINRA rules do not confer on this Court jurisdiction to (avoid the forum-selection clause of the parties' Agreement and) compel arbitration of this action under FINRA procedures; (2) common law principles of estoppel, agency, and corporate veil-piercing/alter-ego theory do not support an Order compelling Plaintiff to submit to FINRA arbitration; and (3) FINRA Rule 13200(b) prohibits arbitration of disputes arising out of the insurance business activities of a member that is also an insurance company, and a significant portion of Defendant's business activities, while employed by Plaintiff,

involved selling personal insurance.  (*See generally* Dkt. No. 16 [Plf.'s Response Memo. of Law].)

Generally, in reply, Defendant argues as follows: (1) Plaintiff should be estopped from avoiding arbitration because it received a direct benefit from Defendant's signing the FINRA registration agreement (i.e., the Form U-4 Agreement); (2) Plaintiff must arbitrate this employment dispute because Mercer, the FINRA member that sponsored Plaintiff's employees to register with FINRA, is Plaintiff's "alter ego;" (3) Plaintiff should be bound by the arbitration clause of the Form U-4 Agreement because Mercer is Plaintiff's agent; and (4) the Court should order expedited discovery if additional information is needed to establish the above contract theories.  (Dkt. No. 19 [Def.'s Reply Memo. of Law].)[1]

## II.     RELEVANT LEGAL STANDARD

Defendant's motion to compel arbitration is made under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., which requires federal courts to enforce arbitration agreements and stay any litigation that contravenes such agreements.  9 U.S.C. §§ 2 and 3; *McMahan Sec. Co. v. Forum Capital Markets*, 35 F.3d 82, 85-86 (2d Cir. 1994).  The FAA does not require parties to arbitrate, however, "when they have not agreed to do so."  *McMahan Sec. Co.*, 35 F.3d at 85-86 (quoting *Volt Info. Scie. Inc. v. Bd. of Tr.*, 489 U.S. 468, 478 [1989]).

---

[1] The Court notes that, approximately eight months after briefing was completed on Defendant's motion to compel and/or stay, Defendant filed a motion to supplement his motion to compel and/or stay.  (Dkt. No. 24.)  Plaintiff opposed Defendant's motion to supplement.  (Dkt. Nos. 25, 26.)  After carefully considering Defendant's motion to supplement, the Court finds that motion to be unsupported by a showing of cause for the reasons identified by Plaintiff in its response.  In the alternative, the Court finds Defendant's motion to supplement to be futile, based on the inability of the material in question to alter the Court's decision on Defendant's motion to compel and/or stay.  As a result, the Court denies Defendant's motion to supplement.

Absent an express agreement to arbitrate, the Second Circuit has recognized only the following five "theories upon which it is willing to enforce an arbitration agreement against a non-signatory: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995). Limiting these exceptions serves to "protect parent companies" when subsidiaries enter into arbitration agreements. *Thomson-CSF, S.A.*, 64 F.3d at 780 (noting that "[a]nything short of requiring a full showing of some accepted theory under agency or contract law imperils a vast number of parent corporations").

## III.  ANALYSIS

As stated above in Part I.C. of this Decision and Order, Defendant relies on common law principles of estoppel, agency, and corporate veil-piercing/alter-ego theory, in arguing that his employment dispute with Plaintiff should be arbitrated before FINRA. After carefully considering the arguments raised by Defendant in his motion papers, the Court finds that the arguments are without merit for the reasons that follow.[2]

Before addressing each of Defendant's arguments, the Court finds it necessary to pause and emphasize two facts. First, Defendant has not adduced a copy of the Form U-4 Agreement that assertedly bears his signature, not to mention a copy of a Form U-4 Agreement indicating

---

[2] For the sake of brevity, the Court assumes, for purposes of this Decision and Order, that FINRA has jurisdiction to consider Plaintiff's claims against Defendant, even though Plaintiff is not a member or associated person. *But see Variable Annuity Life Ins. Co. (VALIC) v. Dull*, 09-CV-80113, 2009 WL 3064750, at *3 n.3 (S.D. Fla. Sept. 22, 2009) ("FINRA's jurisdiction is limited to claims between or among members and/or associated persons on both sides of the dispute. . . . VALIC . . . is not a member or associated person of FINRA . . . . Since Rule 13200 permits arbitration only at the insistence of members or associated persons against members or associated persons, this dispute is outside the scope of FINRA's jurisdiction.").

that Mercer was Plaintiff's "firm" for purposes of the Form U-4 Agreement (and also a FINRA member).  Second, Defendant has not adduced sufficient evidence for this Court to find that the "dispute, claim or controversy" asserted by Plaintiff in its Complaint is one that (1) "ar[o]se" between Defendant and his "firm, or a customer, or any other person," and (2) was "required to be arbitrated under the rules, constitutions, or by-laws of the [Self-Regulatory Organizations] indicated in Section 4 [of this Application]," as those terms are used in the Form U-4 Agreement. In and of themselves, these two facts constitute sufficient grounds on which this Court may, and does, base its denial of Defendant's motion.

In any event, the Court alternatively bases its denial of Defendant's motion based on its rejection of each of Defendant's arguments, as discussed below.

### A. Corporate Veil-Piercing/Alter-Ego Theory

Defendant argues that Plaintiff so dominates and controls Mercer as to be the alter ego of Mercer, thus justifying the piercing of Mercer's corporate veil, and the enforcement of Form U-4 Agreement's arbitration clause against Plaintiff.  "[C]ourts will pierce the corporate veil 'in two broad situations: to prevent fraud or other wrong, or where a parent dominates and controls a subsidiary.'" *Thomson-CSF, S.A.*, 64 F.3d 773 (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 [2d Cir. 1993]).  Whether an entity dominates or exerts complete control over its subsidiary is "a fact specific inquiry." *Thomson-CSF*, 64 F.3d at 777. Generally, in determining whether it is appropriate to pierce a corporate veil, the Court considers the following ten factors:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) degree of discretion shown by

> allegedly dominated corporation; (7) whether dealings between entities are at arm's length; (8) whether corporations are treated as independent profit centers; (9) payment or guarantee of corporation's debts by dominating entity; and (10) intermingling of property between entities.

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

In support of his argument that Plaintiff dominates and exercises complete control over Mercer, Defendant points to, *inter alia*, the following asserted facts: (1) that Mercer is operated by Plaintiff's employees and exists solely to serve Plaintiff's needs; (2) that there is an overlap among executive officers of Plaintiff and Mercer; (3) that the listed address and telephone number for both firms' corporate headquarters are the same; and (4) that Mercer is not adequately capitalized. (*See generally* Dkt. No. 12, Attach. 1 [Def.'s Memo. of Law].)

As an initial matter, Defendant offers no support for his (conclusory) assertion that Mercer is operated by Plaintiff's employees. Moreover, even assuming that Mercer is indeed operated by Plaintiff's employees, Defendant does not establish the type of day-to-day control that is required to disregard Mercer's distinct identity. As a registered broker-dealer and a member of FINRA, Mercer conducts transactions of securities, participating in a highly regulated industry that requires strict compliance with FINRA rules, which prohibit, among other things, intermingling of corporate funds and those of its customers (i.e., funds of Plaintiff or its clients held by Mercer). In addition, Plaintiff is prohibited by law from interfering with many aspects of Mercer's day-to-day operations and its company's policies.

Furthermore, while Defendant has asserted (conclusorily) that Mercer is undercapitalized, Defendant presented no evidence of intermingling of funds, an absence of

9

corporate formalities, and/or payment or guarantee of Mercer's debts by the dominating entity. *See In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp.2d 513, 538 (S.D.N.Y. 2008) (declining to pierce the corporate veil where the plaintiffs presented "no allegations of the disregard of corporate formalities, inadequate capitalization, intermingling of funds or property, reduced discretion by any entity, failure to deal at arms' length, or payment of the debts of one entity by another").

Simply put, while Defendant has demonstrated some of the factors relevant to a determination that Mercer's corporate identity should be disregarded,[3] this Court finds that Defendant has failed to establish the level of corporate control necessary to justify piercing Mercer's corporate veil and binding Plaintiff, a non-signatory to the Form U-4 Agreement presumably endorsed by Mercer, Plaintiff's affiliate.

### B.     Estoppel

Defendant argues that, under a "direct benefits" estoppel theory, Plaintiff should be bound by the arbitration clause of the Form U-4 Agreement that Defendant signed to register with FINRA because Plaintiff, and not Mercer, is the real party in interest. (Dkt. No. 12, Attach. 1 [Def.'s Memo. of Law].)[4]  A non-signatory party may be estopped from avoiding arbitration

---

[3]     For example, Defendant has sufficiently established (1) an overlap among executive officers of Plaintiff and Mercer, and (2) that Plaintiff and Mercer share common telephone numbers.

[4]     Again, for the sake of brevity, the Court assumes, for purposes of this Decision and Order, that a signatory may commence an action seeking to enforce an agreement against a non-signatory under a theory of direct benefits estoppel. *But see Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361-62 (5th Cir. 2003) (rejecting argument that direct benefits estoppel may be applied in action commenced by the signatory against the non-signatory because the non-signatory "has not sued [the signatory] under the agreement . . . [and therefore] has . . . not 'exploited' the [agreement] to the degree that the cases that consider applying this

where the party knowingly accepted direct benefits from the agreement that contained the arbitration clause. *Thomson-CSF*, 64 F.3d at 778; *accord, MAG Portfolio Consultant, GMBH*, 268 F.3d at 61.[5] "The benefit derived from an agreement is indirect where the non-signatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Thomson-CSF*, 64 F.3d at 778-79.

In support of his estoppel theory, Defendant points to the substantial benefits that flowed directly to Plaintiff as a result of Defendant's execution of the Form U-4 Agreement. More specifically, Defendant asserts that, but for his execution of the Form U-4 Agreement, he could not have rendered financial services to Plaintiff's clients. In addition, Defendant asserts that Plaintiff directly contributed to his decision to execute the Form U-4 Agreement by directing him to register with Mercer. (*See generally* Dkt. No. 12, Attach. 1 [Def.'s Memo. of Law].)

As an initial matter, the Court recognizes that Plaintiff received a benefit from Defendant signing the Form U-4 Agreement and obtaining securities licenses in that Defendant's ability to

---

version of estoppel require").

[5]     As the Second Circuit noted in *MAG Portfolio Consultant*, "*Thomson-CSF* mentions an alternative estoppel theory applicable to arbitration clauses." *MAG Portfolio Consultant, GMBH*, 268 F.3d at 62. "Under this theory, a court will 'estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed,' and the signatory and nonsignatory parties share a close relationship." *Id*. (quoting *Thomson-CSF*, 64 F.3d at 779). "However, because arbitration is guided by contract principles, . . . a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." *Id*. Here, Defendant is the signatory of the Form U-4 Agreement. As a result, he may not estop Plaintiff from avoiding arbitration under this alternative "issues-intertwined-with-the-agreement and close relationship" estoppel theory.

sell securities became an additional service that he could offer to his clients.  However, to bind a non-signatory to an arbitration agreement under principles of estoppel, "the benefits of the agreement to the non-signatory must be direct–that is, flow directly from the agreement." *Phoenix Co., Inc. v. Abrahamsen*, 05-CV-4894, 2006 WL 2847812, at *6 (S.D.N.Y. Sept. 28, 2006) (noting that "[t]he benefit derived from an agreement is indirect where the non-signatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself").

     Here, it is unclear whether Plaintiff benefitted financially from Defendant signing the Form U-4 Agreement and obtaining securities licenses.  For example, as Plaintiff's Senior Vice President and General Counsel states in her affidavit, "[a]ny revenue generated by Mercer is paid to Mercer by the insurance carrier whose variable product is sold to [Plaintiff's] client[, and] [t]he contract that provides for the payment of Mercer's revenue by the insurance carrier is between the carrier and Mercer, not [Plaintiff]."  (Dkt. No. 16, Attach. 1, at ¶ 17.)  Moreover, even assuming that Plaintiff did somehow benefit financially from Defendant obtaining securities licenses, Defendant has failed to sufficiently establish that this benefit flowed directly from the Form U-4 Agreement (and, in particular, its arbitration clause).

     The Court notes that Defendant has not established that Plaintiff (1) participated in negotiating the Form U-4 Agreement, (2) is mentioned in the Form U-4 Agreement, (3) received fees as a result of the Form U-4 Agreement, or (4) has sought to enforce against Defendant any particular provision of the Form U-4 Agreement.  *See Oppenheimer & Co. Inc. v. Deutsche Bank AG*, 09-CV-8154, 2010 WL 743915, at *3 (S.D.N.Y. Mar. 2, 2010) ("The benefits that [non-signatory] realized from [affiliate]'s FINRA membership are more akin to the indirect benefits in

*Thomson-CFS* and *Phoenix Companies* than the direct benefits in *Deloitte Noraudit A/S*. [Affiliate]'s FINRA membership allowed it to operate as a securities broker-dealer. While [plaintiff] alleges that [non-signatory] gained financially from [affiliate]'s activities as a FINRA member, it has not alleged that [non-signatory] itself operated as a broker-dealer or that [non-signatory] sought to enforce any particular provisions of [affiliate]'s FINRA membership. Rather . . . [non-signatory] benefitted as [affiliate]'s parent by taking advantage of [affiliate]'s broker-dealer relationships with its clients.").[6]

Finally, while Defendant has offered undisputed evidence that Plaintiff directed

---

[6] *See also World Group Sec., Inc. v. Allen*, 07-CV-1657, 2007 WL 4168572 (D. Ariz. Nov. 20, 2007) (concluding that nonsignatory received direct benefits from contract signed between investment products provider and customers that contained arbitration clause because nonsignatory acknowledged it knowingly received fees generated from customers whose obligation to pay those fees was derived from contract containing arbitration clause); *Wood v. PennTex Res., L.P.*, 458 F. Supp.2d 355, 370-71 (S.D. Tex. 2006) (concluding that nonsignatory received direct and substantial benefits because [1] he participated in negotiating relevant agreement, [2] he was named in agreement, [3] he was involved in agreement's execution and performance, and [4] agreement provided nonsignatory with protection against individual exposure from certain claims, indemnified nonsignatory for certain claims, and named nonsignatory as an indemnified party); *Phoenix Co., Inc. v. Abrahamsen*, 05-CV-4894, 2006 WL 2847812, at *7 (S.D.N.Y. Sept. 28, 2006) (finding direct-benefits estoppel inapplicable because, although nonsignatory derived benefits from relationship between parties who agreed to arbitration, by virtue of various corporate relationships and separate contracts, nonsignatory did not have involvement in execution or performance of relevant contract incorporating arbitration requirement, and had nothing to do with signatories' decision to sign forms containing arbitration requirement); *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 684 (7th Cir. 2005) (finding direct benefits estoppel inapplicable to subsidiary of company that signed deductible agreements with insurance company containing arbitration clauses because subsidiary did not sign deductible agreements, had not sought to enforce any rights under deductible agreements, and "[e]ven assuming that [subsidiary] benefitted from the deductible agreements by paying lower insurance premiums based on the deductibles, this benefit [wa]s too attenuated and indirect to force arbitration under an estoppel theory"); *Legacy Wireless Servs. v. Human Capital, L.L.C.*, 314 F. Supp.2d 1045, 1053 (D. Or. 2004) (finding non-signatory received direct and substantial benefits because nonsignatory had received fees and allegedly "played an important role in the consummation of the agreement and in assisting [a signatory's] fulfilling its contractual obligations").

Defendant to register with FINRA through Mercer,[7] and that Plaintiff even paid for the training materials Defendant used to study for the securities examinations, these facts alone do not establish that Plaintiff received a direct benefit from Defendant's execution of the Form U-4 Agreement.  Rather, at best, these facts establish that Plaintiff sought to exploit its relationships with Mercer and Defendant, and the contractual relationship between those parties.

The Court notes that one of the reasons it is unwilling to presume such a direct benefit under the circumstances is that, as stated above, Defendant has not established that Plaintiff receives any form of compensation as a result of requiring its employees to register with FINRA through Mercer.  Instead, it appears that Plaintiff requires its employees to register with FINRA through Mercer because Plaintiff and Mercer are affiliates owned by the same entity, The Goldman Sachs Group, Inc. ("Goldman Sachs").  In other words, based on the current record, it appears that this requirement reflects nothing more than a logical goal of driving business from one corporate-owned entity (Plaintiff) to another (Mercer), at no adverse expense (and with some indirect benefits) to the former.[8]

    **C.**    **Agency**

---

[7] In fact, Senior Vice President of Ayco, Mae A. Cavoli, stated in her affidavit that "as part of becoming assimilated into the Ayco team, [Defendant] was required to study for and obtain licensing for both insurance and securities products." (Dkt. No. 16, Attach. 1, at ¶ 25 [Decl. of Mae A. Cavoli].)  She further stated that "[Defendant]'s securities license, while provided through Mercer, was just one of eleven professional licenses [Defendant] was required to hold in order to provide the many services available to Ayco clients." (*Id*. at ¶ 26.)

[8] The Court is mindful of Defendant's statement in his reply affidavit that he "believe[s]" that he generated substantial revenue "directly to [Plaintiff]" through "securities related business." (Dkt. No. 20 at ¶ 6.)  However, it has yet to be determined, through discovery, that Plaintiff received a direct financial benefit from the Form U-4 Agreement (as opposed to as a result of its corporate relationship and separate contracts with the parties).

Defendant argues that an agency relationship between Mercer and Plaintiff exists such that Plaintiff, as a non-signatory, is bound by Mercer's agreement to arbitrate with Defendant. Defendant argues that an agency relationship exists because (1) Plaintiff and Mercer have an affiliate relationship (i.e., they are both entities "owned" by Goldman Sachs), and (2) Plaintiff's actions, in directing Defendant to register with FINRA through Mercer, give rise to the appearance and reasonable belief that Mercer acts as Plaintiff's agent for the purpose of obtaining and maintaining securities licensing for Plaintiff's employees.

As an initial matter, the Court rejects the argument that Plaintiff had an agency relationship with Mercer by virtue of their affiliate relationship. *See Merrill Lynch Inv. Managers v. Optibase, LTD.*, 337 F.3d 125, 130 (2d Cir. 2003) (rejecting the argument that two subsidiaries of the same parent were each other's agents because they were commonly controlled, noting that "mutual benefits derived from affiliation . . . [are] insufficient to bind a non-signatory on agency principles to an arbitration agreement signed by an affiliate.").

Moreover, the Court rejects Defendant's argument that Plaintiff's actions, in directing Defendant to register with FINRA through Mercer, demonstrate that Mercer is Plaintiff's agent for purposes of sponsoring Defendant to obtain his securities licenses. "Traditional principles of agency law may bind a non-signatory to an arbitration agreement." *Thompson-CSF*, 64 F.3d at 777. "Under New York law, an agent's authority may be express, implied or apparent." *Flame Cut Steel Prod. Co., Inc. v. Performance Foams & Coatings, Inc.*, 46 F. Supp.2d 222, 228 (E.D.N.Y. 1999).

To establish the existence of express or implied authority, a plaintiff must show "(1) the manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the

undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Paul T. Freund Corp. v. Commonwealth Packing Co.*, 288 F. Supp.2d 357, 373 (W.D.N.Y. 2003).

Here, Plaintiff's actions in directing Defendant to register with FINRA through Mercer may constitute a manifestation by Plaintiff that Mercer "shall act" on its behalf in sponsoring Defendant's FINRA application. In addition, by sponsoring Defendant's Form U-4 Agreement, Mercer may have exhibited its acceptance to the undertaking. However, Defendant points to no evidence establishing the "understanding of the parties that the principal is to be in control of the undertaking." Moreover, the record establishes that Plaintiff, as a non-member of FINRA, is prohibited from sponsoring Form U-4 Agreements and controlling this process; and an agency relationship cannot exist where the alleged agent performs an act that principal could not on its own perform. *See Mouawad Nat. Co. v. Lazare Kaplan Int'l, Inc.*, 476 F. Supp.2d 414, 423 (S.D.N.Y. 2007) ("Before a principal can confer actual or apparent authority on another to act on its behalf, the principal must itself possess the power that it is attempting to confer on the agent. . . . . It is axiomatic that where a principal does not possess the power to bind itself to a third person in contract, there is no power that the principal can confer on an agent that will enable the agent to enter the contract on the principal's behalf.").[9]

For these reasons, the Court rejects Defendant's argument that an express or implied agency relationship between Mercer and Plaintiff can be inferred from Plaintiff's actions.

---

[9] *See also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Eaton*, 701 F. Supp. 1031, 1035 (S.D.N.Y. 1988) ("It is basic to an agency relationship that the agent acts subject to the principal's direction and control."); *Kyung Sup Ahn v. Rooney Pace, Inc.*, 624 F. Supp. 368, 370 (S.D.N.Y. 1985) ("The element of subservience is essential, for there can be no agency relationship where the alleged principal holds no right of control over the alleged agent.").

Furthermore, the Court rejects Defendant's argument, to the extent it is being asserted, that an agency relationship between Mercer and Plaintiff exists based on a theory of apparent authority.

> Under New York law . . . [e]ssential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal-not the agent. Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable.

*Flame Cut Steel Prod. Co., Inc.*, 46 F. Supp.2d at 228 (quoting *Hallock v. New York*, 64 N.Y.2d 224, 231 [N.Y. 1984]).

Here, any such apparent authority argument would appear to be premised solely on Plaintiff directing Defendant to register with FINRA through Mercer. However, Defendant has not offered evidence that, before he signed the Form U-4 Agreement, Mercer represented that it was Plaintiff's agent. Furthermore, even assuming that Mercer somehow misrepresented its relationship with Plaintiff, Defendant has failed to establish how he actually relied on the misrepresentation (i.e., signed the Form U-4 Agreement *because* he believed that Mercer was Plaintiff's agent). *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 97-CV-4978, 2002 WL 88226, at *11 (S.D.N.Y. Jan. 23, 2002) (finding that plaintiffs, who invested with a broker, failed to establish that, in investing with the broker, they actually relied on the broker's misrepresentation that he was an agent for defendants, and only invested with him *because* he was defendants' agent); *Property Advisory Group v. Bevona*, 718 F. Supp. 209, 214 (S.D.N.Y. 1989) ("[In order

to bind a principal on the theory of apparent authority, the third party must . . . change its position in reliance on the agent's act."). Rather, the evidence establishes that Defendant signed the Form U-4 Agreement because doing so was a prerequisite, under FINRA, to selling securities. In addition, the Court finds that Defendant has failed to establish that Plaintiff misled him into believing that Mercer was Plaintiff's agent. For example, Defendant does not offer any statements by any representatives of Plaintiff that would have given him this impression.

For these reasons, the Court rejects Defendant's argument that Plaintiff's conduct in directing Defendant to register with FINRA through Mercer "gives rise to the appearance and belief" that Mercer is Plaintiff's agent.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion to stay this action and compel arbitration or in the alternative, to dismiss this action for lack of subject-matter jurisdiction (Dkt. No. 12) is **DENIED**; and it is further

**ORDERED** that Defendant's motion to supplement his motion to compel and/or stay (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED** that this case be referred to Magistrate Judge Treece for a Rule 16 conference to issue scheduling deadlines.

Dated: August 18, 2011
       Syracuse, New York

_____
Hon. Glenn T. Suddaby
U.S. District Judge